5IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER GRAHAM | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 09 C 6564 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| AT&T MOBILITY LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Christopher Graham sued his employer AT&T Mobility LLC ("AT&T"), asserting that AT&T retaliated and discriminated against him because of his race, and subjected him to a racially hostile work environment. Graham and AT&T are in near-constant litigation: this is Graham's third Title VII suit against AT&T and he files charges regularly with the Equal Employment Opportunity Commission (EEOC). In this case, Graham asserts that his manager should have picked him to "act up" in a supervisory capacity based on his seniority, and contends his managers subjected him to reprimands, negative performance reviews and forced him to take medical leave because he is black. AT&T moves for summary judgment, contending that it never took any adverse employment action against Graham, and in any event, nothing AT&T did was pretext for racial animosity. For the below reasons, the Court grants AT&T's motion in its entirety.

I.    **MATERIAL UNDISPUTED FACTS**

A.    **Background**

Graham has been a wireless technician for AT&T since 1993 and is assigned to the Field Engineering Department responsible for maintaining AT&T cellular towers in the Chicagoland area.

(Pl. 56.1 Resp. ¶¶ 1-2.)  As a technician, Graham is represented by the Communications Workers of America (CWA) and a collective bargaining agreement (CBA) between the CWA and AT&T governs his employment.   (Pl. 56.1 Resp. ¶ 1.)  David Lindon was Graham's direct supervisor between 2005 and fall 2008, when Albany Zeno, who is black, took over.  (Pl. 56.1 Resp. ¶¶ 1-2.)  Tracy Ryan has been human resources manager at AT&T since 2000.  (Pl. 56.1 Resp. ¶ 5.)

**B.    EEOC Charges and Previous Suits**

At regular intervals during his employment at AT&T, Graham filed seven separate charges of discrimination with the EEOC, all of which allege that AT&T discriminated or retaliated against him because of his race.  (Pl. 56.1 Resp. ¶¶ 8-9, 11, 13, 15-17.)  In addition, Graham filed two Title VII suits against AT&T before this one, both of which were decided in AT&T's favor, the first on a motion to dismiss and the second on summary judgment.  (Pl. 56.1 Resp. ¶¶ 10, 14; *see also* N.D. Ill. Case Nos. 04 C 540 and 05 C 994)  Graham filed this suit based on his November 2006, August 2007 and November 2008 EEOC charges, which allege violations of Title VII with respect to number of incidents, including:

- he was not permitted to leave a training early;

- he was not permitted to have a union representative in his performance review;

- a co-worker told him that the co-worker did not appreciate being asked about Graham's discrimination claims;

- a manager falsely accused him of not responding to the manager's email;

- his employee name tag went missing;

- his manager offered a temporary supervisory assignment to technicians with less seniority;

- a manager reprimanded him for not repairing an "unsafe" site;

- a manager disciplined for copying certain employees on emails;

- AT&T required him to take an exam and obtain medical releases before returning to work following an injury;

- an IT technician accessed his company-issued laptop without Graham's permission;

- AT&T retaliated against him for bringing the other EEOC charges and lawsuits.

(Pl. 56.1 Resp. ¶¶ 15-17, 19.)  In his brief opposing summary judgment, Graham dropped his contentions that AT&T took adverse employment actions against him with respect to the training class, denying him a union representative at his performance evaluation, the co-worker incident, and the name tag issue.  (*See* Doc. 65.)  Consequently, the Court will focus on the remaining issues.

## C. Temporary Supervisor Assignments

In Graham's department, whenever a manager is out of the office, he or she may select a technician to temporarily "act up" as a supervisor while he or she is gone, or ask another manager to cover for him or her.  (Pl. 56.1 Resp. ¶ 49.)  According to Lindon, when he was Graham's supervisor, he picked three other technicians (all less senior than Graham) to act as temporary supervisors because they had prior experience serving as union stewards, and he believed that steward experience would help them serve in a managerial position.  (Pl. 56.1 Resp. ¶ 52; Def. 56.1 Resp. ¶ 5.)  Lindon asserts that he did not consider seniority when making the assignments.  (Pl. 56.1 Resp. ¶ 54.)  When Graham asked Lindon why Graham did not receive the supervisor assignments, Lindon told him to file a grievance with the union regarding the issue.  (Def. 56.1 Resp. ¶ 29.)  Similarly, Zeno contends he did not consider seniority, but rather asked technicians to

volunteer and then he would select the technician who had no scheduled days off while Zeno was gone. (Pl. 56.1 Resp. ¶ 56.) Zeno picked Graham to act as a temporary supervisor for a week in late 2009, again in early 2010, and then again two weeks in June 2010. (Pl. 56.1 Resp. ¶ 57.)

The article of the CBA which covers technicians acting as temporary supervisors does not require that the assignments by made on the basis of seniority; it only dictates that the technicians receive 10 percent extra pay for acting up. (Pl. 56.1 Resp. ¶¶ 49-50; *see also* CBA Article 19, Doc. 58-4 at 38.)[1] The CBA also has a reservation clause that states that "[s]ubject to applicable law, all rights possessed by the employer prior to the recognition of the [CWA], which rights are not governed by the terms of this [CBA], are reserved and retained by the employer." (Pl. 56.1 Resp. ¶ 51.) Consequently, AT&T's position is that temporary supervisor assignments may be made at management's discretion. (*Id*.) Larry Barrett, a wireless technician since 1993 and chief union steward for the CWA, testified that AT&T's position since 2002 has been that temporary supervisor positions are not given out based on seniority, and that under the CBA the assignments are in the manager's discretion. (Pl. 56.1 Resp. ¶ 53; Def. 56.1 Resp. ¶ 1; Barrett Dep. at 69-71.)[2]

Graham, the most senior technician in his zone, disputes AT&T's interpretation of the CBA's provisions, and asserts that AT&T's selection of temporary supervisors is governed by seniority. (*Id.*; Def. 56.1 Resp. ¶ 2.) In support, he does not cite to any provision of the CBA, but rather his own declaration and that of another technician, Charles Roberts, as well as the testimony of Kitira Smith. (*Id.*; Def. 56.1 Resp. ¶ 1.) Graham and Roberts' declarations state "[t]he manager is required

---

[1] AT&T employees sometimes refer the 10 percent increase in pay from acting up as a temporary supervisor as "RPP" or "RPP pay." (Def. 56.1 Resp. ¶7.)

[2] Barrett filed a grievance with the union regarding AT&T's position of not considering seniority in making temporary supervisory assignments. (Pl. 56.1 Resp. ¶ 59.)

pursuant to the union contract to advise all [technicians of Graham's rank] of the availability of the temporary supervisor assignment because selection is determined by seniority," but cite nothing in support of that statement. (Graham Dec., Doc. 68-2, at ¶ 9; Roberts Dec., Doc. 68-5, at ¶ 6.) Smith is an employee and union steward in AT&T's Customer Service Group, which is an entirely separate department from Graham's department and has different procedures and managers. (Def. 56.1 Resp. ¶ 1; Ryan Supp. Dec., Doc. 76-2, ¶ 4.) Though Smith testified at her deposition that under the CBA, temporary supervisor positions should be based on seniority (Smith Dep. at 22-23), she agreed Article 11, which covers seniority, and Article 19, which covers temporary supervisory positions, do not state that the assignments must be based on seniority. (Def. 56.1 Resp. ¶ 1; Smith Dep. at 79-89.) Smith then conceded that she could not identify any language in the CBA that required AT&T to consider seniority for temporary supervisor assignments, and that she had no personal knowledge of how the assignments were given out in Graham's department. (Smith Dep. at 91-92.)

Graham asserts that he lost the opportunity to move into management because he did not have any experience as a temporary supervisor. (Def. 56.1 Resp. ¶¶ 30-31.) However, Graham never applied for a management position because he wanted to keep his union protection. (Def. 56.1 Resp. ¶ 19.)

### D.     2005 Performance Review, Reprimands and Written Warning

In February 2006, Graham received his performance evaluation for 2005, which stated that he met some, but not all, performance objectives. (Pl. 56.1 Resp. ¶ 26.) One comment on his review noted that he forgot a command when working on a cell tower that caused the entire site to go down, rather than just a part of it. (Pl. 56.1 Resp. ¶ 27.) Graham objected to this comment, asserting that the site went down because he had to reset the entire site, not because he forgot a command. (*Id.*)

Graham did not lose any pay and his job duties and assignments did not change as a result of the performance evaluation. (Pl. 56.1 Resp. ¶ 26.)

On April 24, 2006, Lindon sent an email to Graham and other technicians assigning them to inspect certain cell sites by the next day. (Pl. 56.1 Resp. ¶ 30.) By the morning of April 26, Lindon had not heard from Graham and sent him a reminder email. (Pl. 56.1 Resp. ¶ 31.) Graham responded later that day saying he had not read Lindon's email until that morning (as he had been away from work) and that Lindon should have called him if it was important. (Pl. 56.1 Resp. ¶ 31.) Lindon then sent more emails to Graham instructing him to check his email more often, explaining how to sort his email by sender in order to prioritize them, and asking him to give his requests the same priority given by the other technicians. (Pl. 56.1 Resp. ¶ 32.) Graham then made an "official complaint" to Ryan that Lindon "has been accusing [him] of not doing [his] job or taking care of [his] responsibilities." (Pl. 56.1 Resp. ¶ 33.) Ryan asked to meet with Graham, but he refused to meet with her without a union representative. (*Id.*) Ryan reviewed the emails in question and determined that Lindon's instructions were warranted. (Pl. 56.1 Resp. ¶ 34.)

About six months later, in late October 2006, a cell site at 19th and Halsted Streets in Chicago went down. (Pl. 56.1 Resp. ¶ 35.) Graham went to the site, but became uncomfortable when someone there asked him for money and began "casing his truck." (*Id.*) Graham called a second technician to help him, and then left the site to go to Schaumburg, a suburb northwest of Chicago, to look for parts. (Pl. 56.1 Resp. ¶ 36.) Graham was taking a lunch break in Schaumburg when another technician asked him why he was eating lunch when the site was down. (*Id.*) Lindon commented that the other technician was correct, which embarrassed Graham, because Graham believed that Lindon's "reprimand" was unwarranted given Lindon approved Graham's decision to

go back to Schaumburg. (*Id.*; Def. 56.1 Resp. ¶ 23.) Lindon eventually assigned another technician to fix the site because Graham's shift was almost over. (Pl. 56.1 Resp. ¶ 38; Def. 56.1 Resp. ¶ 16.)

In December 2006, Graham sent an email to Lindon telling him that Graham would be unable to fix a site and that Lindon needed to send someone else to fix it. (Pl. 56.1 Resp. ¶ 60.) Lindon sent an email back to Graham, telling him that he should call, not email, about that sort of problem in case Lindon was in a meeting. (*Id.*) Graham responded to Lindon complaining about " derogatory reviews" Graham received recently from Lindon and from John Coffey, a former supervisor, almost two years prior. (Pl. 56.1 Resp. ¶ 61.) Graham copied Ryan and Smith on his email, along with a more senior human resources executive, a manager in the asset protection department, the director of network communications, and the vice president of the Central Region Network. (*Id.*) According to Graham, he copied the other managers because he had discussed discrimination with those individuals before, and AT&T's policy provided that he complain to higher-ups if he felt he had been subject to discrimination. (Def. 56.1 Resp. ¶¶ 42, 44, 46.) Lindon responded to just Graham, telling him that he preferred to be called in emergencies, that Graham should not send emails re-hashing old issues, and that Graham should contact human resources, the ethics hotline or file a union grievance if Graham felt he was being treated unfairly. (Pl. 56.1 Resp. ¶ 62; Def. 56.1 Resp. ¶ 11.)[3] Lindon also told Graham to stop copying individuals on his emails that had no business reason to be on them, and that he should email those people separately if he wanted to communicate with them. (Pl. 56.1 Resp. ¶ 63.) Graham responded to Lindon, again copying the other managers, asserting that company policy directed him to contact Lindon's supervisors and union representatives

---

[3] AT&T's Equal Employment Opportunity Policy provides that employees may make complaints of discrimination to a supervisor, higher management, the human resources department, or the ethics hotline. (Def. 56.1 Resp. ¶ 12.)

about Lindon's discrimination and retaliation. (*Id.*; Doc. 58-4 at 78.) Near the end of December 2006, Graham sent an email to the manager in the asset protection department, copying many of the same employees as before as well as the executive director of human resources. (Pl. 56.1 Resp. ¶ 64.) That email, in part, complained about Graham's 2005 performance evaluation, issued 10 months before. (*Id.*)

After consulting with AT&T's human resources and legal departments, Lindon gave Graham a written warning for not heeding Lindon's directions to (1) stop rehashing old issues over email; (2) stop copying employees with no business reason to be on the emails; (3) call, not email, if there was a problem with a cell tower. (Pl. 56.1 Resp. ¶¶ 65-66.) Lindon attached the emails at issue to the warning. (Pl. 56.1 Resp. ¶¶ 67-68.) According to Lindon, he issued the written warning because Graham's actions were insubordinate and disruptive to his management of the department. (Pl. 56.1 Resp. ¶ 70.) Graham complained about the warning to AT&T's ethics hotline, explaining he believed it was retaliatory. (Pl. 56.1 Resp. ¶¶ 72-73.) A human resources manager investigated, and found that the warning was both appropriate and not retaliatory. (Pl. 56.1 Resp. ¶¶ 74-75.)[4] AT&T did not demote Graham, dock his pay, or change any of his duties as a result of the warning, though Graham asserts that the warning made him ineligible for temporary supervisor assignments, and that an AT&T higher-up told Graham he could not apply for a promotion while under discipline. (Pl. 56.1 Resp. ¶ 76; Def. 56.1 Resp. ¶¶ 19, 28.) It is undisputed, however, that AT&T never put Graham on probation during his time with the company. (Def. 56.1 Resp. ¶ 15.) In addition to the written

---

[4]Graham asserts that Ryan's declaration on this point is hearsay. However, the declaration states only that Rick Gomez, another human resources manager, was assigned to investigate Graham's complaint and that AT&T's records indicated that Gomez found the warning was appropriate. Ryan's declaration is not hearsay - it is based on personal knowledge (that Gomez was the manager assigned to the complaint) and her personal review of the records at issue.

warning, Graham asserts that Lindon verbally told him to stop complaining to Kaufenberg. (Def. 56.1 Resp. ¶ 48.)

## E.     Medical Leave

In May 2006, Graham told Lindon and Ryan that he could not access a cell tower site because of a knee injury.  (Pl. 56.1 Resp. ¶ 78.)  Ryan sent him an Americans With Disabilities Act form and told him to return it to Denise Hemmingson, who served as Graham's "return to work" manager. (Pl. 56.1 Resp. ¶ 79.)  Graham's physician, Dr. Robin Snead, completed the form and wrote that Graham had "degenerative joint disease" in his knee and that he should not walk extended distances, climb ladders or lift over 30 pounds.  (Pl. 56.1 Resp. ¶ 80.)  Though AT&T's technician job description requires the technician to be able to climb ladders and carry 60 pounds, Hemmingson determined that the company could accommodate Graham's restrictions because, per Dr. Snead, they were expected to last just six months.   (Pl. 56.1 Resp. ¶¶ 81-83.)  Hemmingson sent Graham an "accommodation memo" listing how his duties would change (including eliminating 24 hour on-call duty), and told him that unless she heard otherwise, she would assume the accommodations were agreeable to Graham.  (Pl. 56.1 Resp. ¶¶ 82-85.)  Graham emailed Ryan telling her that he would meet regarding the accommodation if he could bring a witness, but Ryan said they did not need to meet unless Graham wanted to talk about the accommodations.  (Pl. 56.1 Resp. ¶ 86.)  When three weeks passed without a response from Graham, Ryan wrote Graham and told him that she would take his silence as agreement to the accommodations.  (*Id*.)

In November 2006, when Graham's six month accommodation was set to expire, he submitted a new ADA form from Dr. Snead stating that Graham's knee problems remained and that she anticipated they would be long-term, not temporary.  (Pl. 56.1 Resp. ¶¶ 88-89; Def. 56.1 Resp. ¶ 36.)  Dr. Snead also told Hemmingson in a supplemental form and call that Graham should not walk more than a block and should not take more than five steps on stairs.  (Pl. 56.1 Resp. ¶¶ 90-

91.)  In response, AT&T hired two outside vendors to survey the cell tower sites in Graham's zone to determine which sites he could not visit based on his new restrictions.  (Pl. 56.1 Resp. ¶ 93.)  The vendors found 60 sites that had more than five steps or required a ladder to access them, as well as several located more than a block away from a parking lot.  (*Id*.)  Based on this survey, Ryan and Hemmingson told Graham that AT&T could not accommodate his long term restrictions because he could not perform essential job functions.  (Pl. 56.1 Resp. ¶ 94.)  Hemmingson told Graham that, in order to keep him employed at AT&T, the company would put him on 30 days of paid leave for him to search for a job internally.  (Pl. 56.1 Resp. ¶ 95.)  If Graham could not find a job within AT&T in those 30 days, he would be terminated.  (Def.  56.1 Resp. ¶ 36.)  Hemmingson gave Graham a guide to searching for positions within the company and offered to meet with Graham each week to review open positions and to discuss his search efforts.  (Pl. 56.1 Resp. ¶ 96.)  Graham asserts that when his leave began, Lindon angrily told him to turn in his van and gave him limited time to gather his things.  (Def. 56.1 Resp. ¶ 37.)

Four days later, Graham sent Hemmingson a new form from Dr. Snead releasing Graham to return to his technician position with no restrictions.  (Pl. 56.1 Resp. ¶ 97.)  In the same email, Graham asked if he needed to undergo testing to determine his physical abilities, and suggested that AT&T send him to its own doctor to be examined to confirm he could work. (*Id.*)  Based on the change in findings from Dr. Snead, Hemmingson thought it would be best for Graham to have an independent medical examination (IME).  (Pl. 56.1 Resp. ¶ 99.)  The physician who conducted the IME also recommended a functional capacity exam (FCE) to simulate the physical requirements of a wireless technician.  (Pl. 56.1 Resp. ¶¶ 100-01.)  Based on the results of these examinations, Graham returned to work without restriction on March 30, 2007, having received full pay and

benefits while waiting for the examinations to finish. (Pl. 56.1 Resp. ¶¶ 101-02.) Hemmingson managed this process the same way she did for other employees. (Pl. 56.1 Resp. ¶ 104.) Graham has never met Hemmingson and does not know her race or whether she knew about his lawsuits or charges against AT&T. (Pl. 56.1 Resp. ¶ 104.)

A week before Graham returned to work, Ryan sent an email to Tim Kaufenberg, Lindon's supervisor, and told him that Graham would be returning to work. (Pl. 56.1 Resp. ¶ 106; Def. 56.1 Resp. ¶ 52.) Kaufenberg wrote in response: "Although I'm glad to hear he is finally cured after years of feigned disability, I am disappointed that he will be returning that he will be returning to the workgroup. I'm concerned about the negative impact he has on the team. Is there any way or possibility we can prevent his return?" (Pl. 56.1 Resp. ¶ 106; Def. 56.1 Resp. ¶ 50; Doc 58-12 at 21.) Ryan responded that she and Kaufenberg could not prevent Graham's return because he had been medically cleared. (Pl. 56.1 Resp. ¶ 106; Def. 56.1 Resp. ¶ 51.) Kaufenberg had no authority to prevent Graham from going back to work, and was not involved in the decision to put him on leave for the internal job search. (Pl. 56.1 Resp. ¶ 107.)

### F.    Accessing Graham's Assigned Computer

On December 6, 2006, Graham sent Ryan an email telling her that someone had logged onto his company-issued computer and that some of his emails were missing. (Pl. 56.1 Resp. ¶ 39.) The next day a manager in AT&T's corporate security department told Graham the company would investigate the incident, and an IT manager assigned Tim Glantz, a forensic examiner, to look into the issue. (Pl. 56.1 Resp. ¶ 41.) Glantz investigated, determined that an IT administrator had accessed Graham's computer remotely for routine maintenance, and found no evidence that Graham's hard drive, files or emails had been manipulated in any way. (Pl. 56.1 Resp. ¶ 46.)

Graham testified that he has no reason to believe that the IT investigator discriminated or retaliated against him, and AT&T's computer policy states that its IT department may access or monitor company-owned computers at any time. (Pl. 56.1 Resp. ¶¶ 39, 48.)

## II.     STANDARD

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court may "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Tr.*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'"). Plaintiffs, as the parties opposing the motion for summary judgment, "get[] the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314 (7th Cir. 2011).

## III.    DISCUSSION

### A.    Retaliation

Graham asserts that in retaliation for reporting incidents of racial discrimination to AT&T higher-ups and the EEOC, Graham's managers (1) refused to let him "act up" as a temporary supervisor (and, as a result, he did not receive the 10 percent increase in hourly pay and the opportunity to advance); (2) gave him negative job evaluations; and (3) forced him to take medical leave.  (*See* Opp., Doc. 65 at 13-14.) Under the anti-retaliation provision of Title VII, it is unlawful for an employer to discriminate against an employee because he has opposed and unlawful employment practice or because "he has made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." *Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 684 (7th Cir. 2007) (quoting 42 U.S.C. § 2000e-3(a)). "A plaintiff may prove retaliation by using either the direct method or the indirect, burden-shifting method." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006) (quotations and citations omitted).

Under the direct method, "a plaintiff must show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse action taken by the employer; and (3) there was a causal connection between the two." *Id.* at 663 (quotations and citations omitted).  Alternatively, under the indirect approach, to establish a prima facie retaliation case, Graham must show: (1) after filing a charge, he was subject to adverse employment action; (2) at the time, Graham was performing his job satisfactorily; and (3) no similarly situated employees who did not file a charge were subjected to an adverse employment action.  *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004).  If Graham establishes a prima facie case, the burden shifts to AT&T to present evidence of a non-discriminatory reason for its adverse employment action.  *See Tomanovich*, 457 F.3d at 663.

14

Then, if AT&T presents evidence of a non-discriminatory reason for its employment action, the burden shifts back to Graham to demonstrate that AT&T's reason is pre-textual. *Id.*

1. **AT&T's Warnings, Negative Performance Evaluations, Paid Medical Leave and Computer Access Were Not Adverse Employment Actions against Graham**

As a threshold to the analysis under both the direct and indirect methods, the Court considers whether Lindon's warnings, rebukes, and purportedly negative performance reviews of Graham, as well as his medical leave, are adverse employment actions for purposes of his retaliation claims. "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (citing *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004)). In a retaliation case, an adverse action is "one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Roney v. Illinois Dep't of Trans.*, 474 F.3d 455, 461 (7th Cir. 2007). "For purposes of Title VII, there are three general categories of actionable, materially adverse employment actions: (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment." *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir.

2009); *see also Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007) ("For an employment action to be actionable, it must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits.") "[U]nfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions" in retaliation cases. *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010); *see also Mokry v. Partylite Worldwide, Inc.*, No. 07 C 7092, 2009 WL 2588888, at *12 (N.D. Ill., Aug. 20, 2009) (Kendall, J.) (same).

Here, it is undisputed that Graham was not docked pay, transferred, reassigned and did not experience any changes in his duties as a result of the performance review, reprimands or written warnings. Graham without any significant analysis, without citation, that the warnings and rebukes created a humiliating and degrading environment. But any employee would feel badly about a written warning or poor performance evaluation, and Graham does not explain why a written warning or negative review, routinely given in workplaces, was degrading or humiliating to him. Clearly, the warnings and reprimands did not dissuade Graham from engaging in further protected activity: he continued to file charges with the EEOC like clockwork after the reprimands and warnings. Finally, Graham asserts, almost in passing, that his internal job search leave and independent medical evaluation constituted an adverse employment action supporting his retaliation claim. However, Graham never lost any pay while on his medical leave and administrative leave is not a materially adverse employment action. *See Nichols*, 510 F.3d at 786-87 (agreeing with other

circuits that paid administrative leave is not an actionable adverse employment action).[5]  Finally, the

IT employee's maintenance on Graham's computer was not an adverse employment action either.

It is undisputed that the investigation into Graham's computer showed IT department's access and

the maintenance was routine.  In any event, Graham did not suffer any changes in his employment

as a result of the incident.  Consequently, the only arguably actionable adverse employment action

taken by AT&T was to deny Graham the opportunity to be a temporary supervisor.

## 2.  Direct Method - Temporary Supervisor Position

Even if Graham engaged in protected activity and being passed over for a temporary

supervisor position was an adverse employment action, Graham cannot demonstrate retaliation under

the direct method because he cannot show a connection between his protected activity and not being

picked to act as a temporary supervisor.[6]   To establish a causal connection between his protected

conduct and not receiving supervisor assignments, Graham must show that his complaints were "a

substantial or motivating factor" in Lindon's decision not to pick him to act up. *See Gates v.*

---

[5]Even if the leave was an adverse employment action, Graham could not show the decision to place him on leave was pretextual.  Graham's doctor, not AT&T, imposed the restrictions and the complete removal of those restrictions by Graham's doctor just a few days after AT&T told him that he could not continue as a wireless technician is curious at best.

[6]As another court in this district recently noted, the question of whether the burden shifts to the plaintiff to show pretext under the direct method in retaliation cases appears to be an open question in the Seventh Circuit.  *See Komal v. Arthur J. Gallagher & Co.*, No. 09 C 6619, 2011 WL 2415725, at *7 (N.D. Ill. June 13, 2011).  On the one hand, in *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008), the court, citing *Culver v. Gorman*, 416 F.3d 540, 546 (7th Cir. 2005), noted "an employee's failure to cast doubt on an employer's nonretaliatory explanation will also doom a retaliation claim."  On the other, in *Silverman v. Board of Education*, 637 F.3d 729, 734 (7th Cir. 2011), the court found "[o]nce a plaintiff produces [direct evidence of discrimination], the defendant's summary judgment motion must fail, in contrast to the burden shifting approach of the indirect, *McDonnell Douglas* method.  Thus it is relatively unusual to employ the term 'prima facie case' in the context of the direct method . . . ."  Though *Silverman* is a discrimination case, not a retaliation case, its rationale would apply equally to retaliation cases.  In any event, the divide is not dispositive here, because Graham cannot show a causal connection between his protected activity and not being picked to be a temporary supervisor.  If the *Argyropoulos* approach stands, his claim fails under the direct method for the additional reason that he cannot show AT&T's decision to pick union stewards to act as temporary supervisors is pretextual.  (*See* III.A.3.)

*Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008).

Graham's evidence does not demonstrate that Graham's protected activity was any part of Lindon's decision not to pick Graham as a temporary supervisor, let alone a substantial or motivating factor. As to suspicious timing, this is not a case where Graham was a happy employee for years, then complained, and then experienced an adverse employment action. Rather, Graham constantly complained to AT&T higher-ups and the EEOC about perceived discrimination and retaliation, and has been actively litigating against AT&T for years. Because he has complained and litigated so much, by necessity Lindon's decisions to assign others as temporary supervisors came after protected activity from Graham, making suspicious timing poor evidence of causation in this case. For instance, in *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668 (7th Cir. 2011), the plaintiff complained for years about the defendant hospital's compensation system, and then asserted that she was fired for complaining. *Id.* at 675. The Seventh Circuit found that because the plaintiff had complained for years, she had to provide a reason why her most recent complaints triggered retaliation when the past complaints did not. *Id.* Indeed, any rule to the contrary would allow employees to insulate themselves from being fired by continuously complaining about discrimination and then invoking "suspicious timing" later. In any event, Graham has no such explanation here. Further, Graham's assertion that AT&T has taken inconsistent positions as to how it assigns temporary supervisors is also unpersuasive. It is undisputed that AT&T's position with respect to the temporary supervisor positions has been consistent since 2002. Finally, Kaufenberg's email does not establish causation either. As noted below, that email simply reflects a general dislike of Graham and disappointment that he was coming back - it does not mention temporary supervisor assignments or implicate Graham's race in any way.

18

### 3.  Indirect Method - Temporary Supervisor Position

Graham also asserts he has demonstrated AT&T retaliated against him based on his race under the indirect method.  However, even if he could demonstrate a prima facie case, AT&T is entitled to summary judgment because Graham cannot show Lindon's reason for picking other technicians rather than Graham was pretextual.  "Pretext is a lie, specifically a phony reason for some action." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008).  "To show pretext, a plaintiff must show that (1) the employer's nondiscriminatory reason was dishonest; and (2) the employer's true reason was based on a discriminatory intent."  *Id.*; *see also Alexander*, 263 F.3d at 683 (explaining that the only question on summary judgment with respect to pretext is "whether the plaintiff has provided enough evidence from which a rational trier of fact could infer that the employer's stated reasons for taking the adverse action were lies.")  As long as AT&T honestly believed its reason for picking other technicians to be temporary supervisors, Graham cannot survive a motion for summary judgment.  *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003); *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001).

Graham provides no evidence that Lindon's reason for picking other technicians—because of their experience as union stewards—is a lie.  Graham's argument that Lindon's selections were pretextual is premised on his interpretation that the CBA required Lindon to select temporary supervisors based on seniority.  Graham is correct that evidence that Lindon did not follow the CBA could be, in theory, evidence that his selections were pretextual.  However, though the CBA closely regulates many aspects of AT&T's employment relationship with its technicians, its plain words do not require temporary supervisor assignments to be given out to based on technician's seniority.  Indeed, Graham does not rely on any provision of the CBA to argue AT&T assigned temporary

supervisors based on seniority. The only "evidence" Graham offers to dispute AT&T's position with respect to the CBA are his and Roberts's affirmations and Smith's deposition testimony. However, the two affirmations are not proper evidence because they are self-serving and cite nothing to support their assertions. *See Scaife v. Cook Cty.* 446 F.3d 735 (7th Cir. 2006) ("Self-serving affidavits without factual support in the record will not defeat a motion for summary judgment."). And though Smith insisted at her deposition that the assignments should be based on seniority under the CBA, she could not point to any provision in the CBA supporting her view.

It is undisputed that the three technicians Lindon picked instead of Graham were union stewards, and that union stewards have at least some experience in dealing with their fellow technicians. Whether union experience was a good criterion for picking temporary supervisors is not for this Court to decide. *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir.2005) (even "foolish or trivial or even baseless" reasons are not pretextual as long as they are honest); *see also Hudson v. Chicago Trans. Auth.*, 375 F.3d 552, 561 (7th Cir. 2004) (the Court does not "sit as a super-personnel department that reexamines an entity's business decisions"). Finally, Graham suggests that Kaufenberg's email lamenting that Graham was returning to his workgroup after his medical leave is evidence of pretext. Again, that email, however, makes no reference to Graham's race or temporary supervisor assignments, and only suggests that Kaufenberg disliked Graham and felt Graham was a difficult employee to manage. Disliking an employee does not equal pretext, and the email does not suggest that Lindon's stated rationale for picking acting supervisors was not the truth. Because Graham cannot demonstrate causation under the direct method or that AT&T's rationale for picking temporary supervisors was pretextual, AT&T is entitled to summary judgment on Graham's retaliation claim.

### B.    Discrimination

Graham also brings a race discrimination claim based on the same events as his retaliation claim, asserting that he has demonstrated a prima facie case under the indirect method.  As an initial matter, as with his retaliation claim, Graham must experience an adverse employment action to maintain his discrimination claim under the indirect method.  *See Dear v. Shinseki*, 578 F.3d 605, 609 (7th Cir. 2009)  To show an adverse employment action for this claim, Graham must identify a "quantitative or qualitative change in the terms or conditions of employment." *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 532 (7th Cir. 2003).  More specifically, a negative performance evaluation alone is not an adverse employment action for a discrimination claim because it does not necessarily change the terms or conditions of employment.  *See De la Rama v. Illinois Dep't of Human Servs.*, 541 F.3d 681, 686 (7th Cir. 2008).  Consequently, for the same reasons detailed above concerning Graham's retaliation claim, AT&T's denial of temporary supervisor assignments is the only employment action that qualifies as an "adverse employment action" for the purposes of his discrimination claim.  Further, as detailed above, Graham cannot demonstrate that AT&T's reason for not giving him temporary supervisor assignments was pretext, so he cannot defeat summary judgment under the indirect method.  AT&T is entitled to summary judgment on Graham's discrimination claim as well.

### C.    Hostile Work Environment

Graham bases his hostile work environment on both the "acting up" issue and Lindon's written warning to Graham in January 2007 after Graham copied many employees on his email complaining about Lindon's alleged discrimination.   Employers violate Title VII if discrimination based upon race, national origin, gender or age creates a hostile or abusive work environment. *See*

*Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1033 (7th Cir. 2003).  To establish a racially hostile work environment, Graham must submit evidence that: (1) he was subject to unwelcome harassment; (2) the harassment was based upon his race; (3) the harassment was severe and pervasive so as to alter the conditions of the employee's environment; and (4) a basis for employer liability exists.  *See Atanus v. Perry*, 520 F.3d 662, 676 (7th Cir. 2008). For a work environment to be "hostile," the harassment must be "both subjectively and objectively so severe or pervasive as to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005).  To determine whether the harassment was objectively hostile, courts consider all of the circumstances, including frequency and severity of the conduct, whether it is threatening, humiliating or merely offensive, and whether the harassment unreasonably interferes with the employee's work.  *See Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002); *Venters v. City of Delphi*, 123 F.3d 956, 975-76 (7th Cir. 1997). "[T]he environment must be one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Smith v. N.E. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004).

Graham has no evidence he was subject to harassment based on his race, and what he calls "harassment" was not severe or pervasive.  As an initial matter, the "acting up" issue is facially race-neutral because it does not demonstrate "negative attitudes toward African-Americans," or have "racial . . overtones."  *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345-46 (7th Cir. 1999). While harassment need not be explicitly racial in order to be probative of a hostile environment (*id.* at 345), "not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority."  *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005).  As described above, Graham's

managers had discretion to pick technicians to "act up" and Graham has no evidence, other than his own belief, that the managers' decisions were based on race. Further, Lindon's reprimand of Graham for copying many different people on his emails was not retaliation for Graham's complaints about racial discrimination. In the emails at issue, Lindon did not tell Graham to pipe down about racial discrimination. Rather, they invited Graham to properly report any alleged harassment separately and reminded him how to report it. Nor did Lindon warn Graham because he reported discrimination. Lindon warned Graham because he did not follow his explicit instructions not to carbon copy other managers that did not have anything to do with the situation at hand. Even if the reprimand could be construed as having racial overtones, is not objectively severe or, as a single incident, pervasive. AT&T is also entitled to summary judgment on Graham's hostile work environment claim.

IV.    **CONCLUSION**

For the foregoing reasons, AT&T's motion for summary judgment (Doc. 57) is granted in its entirety and final judgment entered in favor of AT&T.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 29, 2011